**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO. 24-CR-510 (CRC)** |
| | : | |
| **v.** | : | |
| | : | |
| **WALTER LEE GOODMAN,** | : | |
| **also known as "Dolo,"** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MOTION FOR PRE-TRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion to detain Defendant Walter Lee Goodman, also known as Dolo, pending trial. Goodman is charged by indictment with one count of narcotics trafficking in violation of 21 U.S.C. § 841(a)(1), two counts of unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1), one count of trafficking in firearms through receipt in violation of 18 U.S.C. § 933(a)(2), and one count of trafficking in firearms through transfer in violation of 18 U.S.C. § 933(a)(1). The government moves for Goodman's detention pursuant to 18 U.S.C. § 3142(f)(1)(C) (narcotics offense punishable by more than 10 years of incarceration) and § 3142(f)(1)(E) (felony involving possession of a firearm) of the Bail Reform Act.

As explained below, Goodman's repeated felonious conduct, to include both violence crimes and trafficking in narcotics and firearms, and his inability to comply with conditions of release while under supervision or on release, puts the community's safety at risk. Considering the facts and circumstances of this case and assessing Goodman's personal history and characteristics, the government submits that there are no conditions or combination of conditions that can reasonably assure the safety of the community should the defendant be released. Nor can Goodman

1

overcome the rebuttable presumption under 18 U.S.C. § 3142(e)(3)(A) that applies. Accordingly, this Court should detain Goodman pending trial.

## BACKGROUND

### I.    Factual Background

#### A.    December 3, 2023: The Initial Meeting / Identifying Goodman

On December 3, 2023, in Southeast D.C., a confidential human source (hereinafter the "CHS") encountered an African-American male in his early to mid-20s who referred to himself as "Dolo." The CHS reported to ATF agents that "Dolo" offered to sell the CHS a quantity of ecstasy (also known as MDMA, that is, 3,4-Methylenedioxymethamphetamine). The CHS and "Dolo" negotiated prices for a future transaction involving either half an ounce or an ounce of MDMA. "Dolo" drove a black Nissan and provided the CHS with a cell phone number of 202-440-****（hereinafter the "Goodman Phone"). A database query associated the Goodman Phone with Goodman.[1] An ATF agent thereafter showed a photograph of Goodman (obtained from a law enforcement database) to the CHS, who stated that the individual in the photograph was the individual the CHS knew as "Dolo."

#### B.    December 4, 2023: The MDMA Transaction

Later on the same day they met, December 3, 2023, the CHS called Goodman on the Goodman Phone at approximately 5:20 p.m. During the recorded call, the CHS said he wanted to buy a "half ounce." Goodman subsequently asked the CHS, "When you want that?" The CHS informed Goodman that he would like to make the purchase the following day, December 4, 2023. The parties discussed where to meet for the transaction, but did not settle on a specific location.

---

[1] According to T-Mobile records, Goodman has been the subscriber of the Goodman Phone since at least November 2021

The following day, December 4, 2023, at 10:41 a.m., the CHS called Goodman on the Goodman Phone and they discussed a location to meet. They agreed to meet in a strip mall near the 4000 block of Minnesota Avenue Northeast, Washington, D.C. During a subsequent recorded call from the CHS to Goodman on the Goodman Phone at 12:05 p.m., Goodman sought to confirm the amount of MDMA the CHS wished to purchase. On the call, Goodman asked, "What you decide to do, bro?" The CHS responded: "I was trying to grab a half, bro." Goodman confirmed: "Ok, alright, I just wanted to make sure, yeah alright that's a bet."

Later that same day, December 4, 2023, the CHS and Goodman met in the aforementioned strip mall, with multiple ATF agents surveilling the area. The CHS captured the meeting on both audio and video recording. During the meeting, Goodman sold approximately 14.7 grams of suspected MDMA—slightly more than a half ounce—to the CHS in exchange for $150. During the meeting, Goodman and the CHS discussed the possibility of Goodman selling the CHS a firearm. The CHS asked, "How much they charge you for one of those?" Goodman responded that it "depends on what you want" and "certain brands" have different prices. Goodman explained that he could sell the CHS one for "five, five hundred" for a certain type and "850" for another type. The CHS said he would follow up in a few days. Below is a still shot of Goodman from the CHS's video of this meeting:



Immediately after the meeting, agents—who had searched the CHS and his vehicle before the meeting—took possession of the substance Goodman sold to the CHS:



Laboratory tests subsequently revealed that the substance Goodman sold the CHS in fact contained N, N-Dimethylpentylone, a schedule I controlled substance under the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, that is often falsely marketed as MDMA but is in fact much more toxic.

C.    <u>December 8, 2023: The Firearm Transaction</u>

Over the course of the following four days, the CHS and Goodman spoke numerous times over the phone (Goodman, always from the Goodman Phone). During these calls, the parties coordinated Goodman's sale of a firearm to the CHS. On December 6, 2023, at 6:37 p.m., the CHS called Goodman on the Goodman Phone about the firearm. The CHS stated that he wished to purchase the firearm soon and expressed interest in the "one for 700 or 800 you [Goodman] were telling me about" earlier that day. Goodman explained that he would need to obtain "it" from a third party to "have it all ready."

Goodman and the CHS ultimately agreed to meet on December 8, 2023. That day, the CHS called Goodman at 1:12 p.m. on the Goodman Phone to confirm the meet time. The CHS asked,

"Which one you gonna grab, the one for 800, 700, which one you grabbing?" Goodman said, "I'm gonna try to get the 8, I think he [the third party] want 850 for it, but I'm gonna try to get that one." Goodman said he would call the third party again to confirm.

Later that same day, the CHS and Goodman met in the same strip mall parking lot in the 4000 block of Minnesota Avenue Northeast, Washington, D.C., where the drug transaction had taken place four days earlier. Multiple ATF agents were surveilling the area. The CHS captured the meeting on both audio and video recording. During the brief meeting—Goodman remained in the driver's seat of his car with another individual in the passenger side, while the CHS approached the driver's side window—Goodman sold the CHS a firearm (a 9-millimeter CZ P-10 C) and ammunition for $950.

Immediately after the transaction concluded, agents— who had searched the CHS and his vehicle before the meeting—followed the CHS and took possession of the firearm and ammunition that Goodman sold the CHS, which is pictured below:

 

An ATF analysis determined that the firearm was manufactured in the Czech Republic.

D.      April 16, 2024: The Residential Search Warrant

On April 16, 2024, agents executed a search warrant at Goodman's residence in Washington, D.C. During the search, one of the agents opened up a trash can and observed a

firearm magazine. The firearm was loaded: it had one bullet in the chamber and 17 in the magazine. The weapon—which a subsequent ATF analysis determined had been manufactured in Brazil—appears below along with the magazine:



Agents also located the Goodman Phone in an area that appeared to be Goodman's bedroom. Agents called the phone number associated with the Goodman Phone and confirmed that the device they had seized was in fact the Goodman Phone.

During subsequent interviews, Goodman confirmed that the firearm belonged to him. Goodman explained that the firearm recovered by the agents was his firearm and that he "found" it one day in a bag while he was walking "in an alley." He told the agents that he "kept it in the [] trash can." Goodman admitted that he was aware he was prohibited from possessing a firearm.

E.    <u>Goodman's Criminal History</u>

Agents determined that Goodman has a lengthy criminal history in D.C. Superior Court, including the following convictions:

- <u>2012 CF2 002009</u>: In 2012, he pled guilty to attempted robbery and ultimately

served 12 months after multiple revocations.

- <u>2012 CMD 021437</u>: In 2013, he pled guilty to misdemeanor distribution of marijuana and possession with intent to distribute marijuana, and was ultimately sentenced to 90 days of incarceration.

- <u>2013 CF3 018296</u>: In 2013, he pled guilty to felony robbery and unauthorized use of a vehicle, and was sentenced to 32 months in prison and three years of supervised release.

- <u>2017 CF2 011171</u>: In 2017, he pled guilty to unlawful possession of a firearm and was sentenced to two years in prison and three years of supervised release.

- <u>2023 CMD 007457</u>: In March 2024, he was convicted after a bench trial of two misdemeanor counts of possession of a controlled substance (PCP and ethylpentylone). Goodman was serving a probationary sentence on these offenses at the time of the April 2024 search warrant at his residence (when he admitted to possessing a firearm that had been located by law enforcement).

F.    <u>The Goodman Phone and the Goodman iCloud</u>

Agents subsequently undertook significant and time-consuming efforts to forensically extract the Goodman Phone. Goodman exercised his rights and refused to provide agents with the password, so law enforcement has been unable to obtain a complete forensic extraction. Agents were, however, able to determine from a partial extraction (and from Apple Inc.) that the Goodman Phone was associated with an Apple iCloud account linked to the Apple ID "dolo5300@icloud.com" (the "Goodman iCloud").

Agents obtained a warrant for the Goodman iCloud and have reviewed the responsive records, which include text messages between Goodman and others, as well as numerous "selfie" photographs of Goodman. Goodman made no meaningful effort in his communications to disguise his identity, regularly referring to himself in his communications as "Walter" or "Walt." He even sent a photo of his birth certificate to another individual.

Neither did Goodman attempt to conceal his criminal livelihood. The information obtained from the Goodman iCloud reflects that Goodman spent much of his time selling drugs and that he

occasionally sold firearms as well. Goodman was explicit in the text messages about his narcotics and firearm trafficking (*e.g.*, "I sell drugs"). There are literally *hundreds* of chats on the Goodman iCloud in which he discussed the purchase or distribution and actually arranged for the purchase or distribution of marijuana, eutylone ("boot"), and other drugs.

Although the Goodman iCloud data captured fewer circumstances in which he bought or sold firearms, the firearm transactions in which he engaged were extremely explicit. Goodman's iCloud chats reflect numerous firearm transactions around the period of the charged conduct here as well as other such transactions within the last few years. For example, just five days after Goodman sold the CHS a firearm, Goodman sought to purchase a different firearm from an individual listed on Goodman's phone as "Mula." On December 13, 2023, "Mula" texted Goodman these three images:

  

"Mula" wrote: "G43 [referring to a Glock 43, a common firearm] 750." Goodman responded, "Ok I want that." "Mula" thereafter responded, "U give me [] 7 walt anybody else 750." Goodman immediately responded: "Ok bet I jih [sic] want that now Fr [for real] or whenever u ready." Goodman's text messages reflect that he subsequently met with "Mula" on December 16, 2023. A week later, "Mula" attempted to sell additional firearms to Goodman, but it is unclear whether Goodman purchased them.

Throughout 2023, no fewer than six individuals sent Goodman images of firearms that appear to be for sale (*e.g.*, "I was bout to show u tht"). A few examples appear below:



Goodman's text messages also reflect that he purchased a firearm in late 2021 (well after he sustained felony convictions that rendered him a prohibited person). On December 21, 2021, an individual listed in Goodman's phone as "Uptown" sent Goodman this photograph:



"Uptown" explained: "On my way you gotta pay me 37.00 for the rounds tho. Fully loaded." Goodman responded, "Ok that's kool." In subsequent text messages that same afternoon, Goodman provided the individual his address—the same residence where ATF agents executed a search warrant and interviewed Goodman in April 2024—and the transaction appears to have been completed.

The text messages also reflect that Goodman has on at least one occasion been a middleman in a firearm transaction, as he was for the CHS here. On January 11, 2022, an individual listed in Goodman's phone as "Pat" texted Goodman asking for a firearm, saying "I need a joint too kuz . . . Glitzy." Goodman asked how Pat wanted the firearm and Pat responded, "Wit the leg." Goodman clarified, "Okay.switch on? [sic]" Simultaneously, Goodman reached out to "Uptown," the same individual who had previously sold Goodman a firearm in December 2021. "Uptown" texted Goodman images of two firearms:

 

Goodman forwarded both images to Pat. Text messages indicated that within two hours Goodman had purchased one of these firearms from Uptown ("On my way!," Uptown texted), and met with

Pat to sell it ("Come outside," Goodman texted). Records obtained from Cash App corroborate Goodman's purchase of the firearm for $850 and subsequent sale for $950 on that same day.

Goodman also demonstrated experience and sophistication with regard to firearms. For example, on February 14, 2022, an individual texted Goodman this photo:



Goodman responded, "That's a ghost. That's not a Glock brand."

## II.    **The Indictment**

On November 12, 2024, a grand jury indicted Goodman in connection with the three key events described above. <u>Count One</u> charges Goodman with possession with intent to distribute N,N-Dimethylpentylone on or about December 4, 2023, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C). <u>Count Two</u> charges Goodman with possessing a firearm and ammunition as a prohibited person on or about December 8, 2023, in violation of 18 U.S.C. § 922(g)(1). <u>Count Three</u> charges Goodman with unlawfully receiving a firearm with reasonable cause to believe such receipt would constitute a felony on or about December 8, 2023, in violation of 18 U.S.C. § 933(a)(2). <u>Count Four</u> charges Goodman with unlawfully transferring a firearm with reasonable cause to believe that the use, carrying, or possession of the firearm by the recipient would constitute a felony on or

about December 8, 2023, in violation of 18 U.S.C. § 933(a)(1). <u>Count Five</u> charges Goodman with possessing a firearm and ammunition as a prohibited person on or about April 16, 2024, in violation of 18 U.S.C. § 922(g)(1).

## **LEGAL STANDARD**

As a preliminary matter, the "rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery. *See Smith*, 79 F.3d at 1210; *Williams*, 798 F. Supp. at 36.

The Bail Reform Act provides, in relevant part, that if a judicial officer "finds that no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). In determining whether any conditions of release will reasonably assure the safety of others and the community, the court must "take into account the available information concerning" four factors set out in 18 U.S.C. § 3142(g). These factors are: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and

seriousness of the danger to any person or the community that would be posed by the person's release. *See* 18 U.S.C. § 3142(g).

The government moves to detain Goodman pursuant to 18 U.S.C. § 3142(f)(1)(C) because Count One of the Indictment—a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C)—carries a maximum term of imprisonment of 20 years. The government also moves to detain Goodman pursuant to 18 U.S.C. § 3142(f)(1)(E) because Counts Two through Five of the Indictment involve the "possession or use of a firearm" within the meaning of that statute.

There is, moreover, a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of Goodman and the safety of the community because the grand jury found probable cause to believe Goodman violated 21 U.S.C. §§ 841(a)(1), (b)(1)(C), which, again, carries a maximum term of imprisonment of 20 years. *See* 18 U.S.C. § 3142(e)(3)(A).[2]

A.    The Nature and Circumstances of the Offense

The nature and circumstances of the offenses here are extremely serious and demonstrate that Goodman is both a danger to the community and a flight risk. Goodman's entire livelihood appears to be centered around the sale of narcotics and firearms. He does not appear to have other employment. A comprehensive review of the Goodman iCloud, which contains a near-complete backup of the Goodman Phone (which itself was seized in Goodman's residence), reflects as much. As noted above, text messages on the Goodman iCloud include *hundreds* of conversations between Goodman and others about narcotics trafficking over the last few *years*. Goodman buys drugs and

---

[2] Defendant should also at the very least be temporarily detained because (a) at the time he unlawfully possessed a firearm in April 2024, he was on probation in the D.C. Superior Court after being convicted of possession of controlled substances (*see* 2023 CMD 007457) and (b) he poses a flight risk and a danger to the community. *See* 18 U.S.C. § 3142(d).

makes electronic payments. Goodman sells drugs and collects electronic payments. Goodman openly discusses drug pricing, drug quantities, and drug supply sources. Based on the iCloud data, Goodman's lengthy and serious criminal history effectively represents only the tip of the iceberg of his criminal behavior.

The charged conduct offers a window into Goodman's world. On December 4, 2023, with barely any knowledge of the CHS, Goodman quickly sold nearly half an ounce (14.7 grams) of N, N-Dimethylpentylone to him. As discussed above, N, N-Dimethylpentylone is often falsely marketed as MDMA. According to a report by the National Institutes of Health, the average reported dose of MDMA is between 60 and 240 milligrams. *See MDMA (Ecstasy) Abuse*, National Institute on Drug Abuse Research Report, National Institutes of Health, *available at* https://nida.nih.gov/sites/default/files/rrmdma_0.pdf. The amount of N-N- Dimethylpentylone Goodman sold to the CHS therefore contained approximately 245 doses (14,700 milligrams divided by 60 milligrams). Only days later, Goodman procured a CZ P-10 C 9mm firearm for the CHS and sold the CHS that firearm along with approximately eight bullets in a parking lot in Northeast D.C. Given the volume of controlled substances Goodman sold to the CHS only days before, and the circumstances surrounding the firearm transaction, it was reasonably foreseeable to Goodman that the firearm would be put to criminal use.

Goodman also engaged in both sales to the CHS while he was on release in a misdemeanor case for possession of PCP and ethylpentylone (another occasional MDMA substitute). After a March 2024 bench trial conviction in that misdemeanor case, Goodman was essentially gifted a one-year probationary term. Yet, within a month after this conviction, and despite his previous conviction for unlawfully possessing a firearm, Goodman nevertheless elected to retain a firearm in his residence, which was recovered during the April 2024 search warrant at Goodman's

residence. The firearm had a magazine that could hold at least 17 bullets. Goodman informed the agents that he "found" the firearm approximately *two years* earlier while walking "in an alley." Taking Goodman at his word, since April 2022 he was a felon in possession of a firearm; a felon who was routinely and consistently selling narcotics and firearms. Notably, according to the pre-trial services report, Goodman was released from prison in approximately November 2021, showing he wasted no time returning to his criminal livelihood.

The nature and circumstances of the offenses weigh strongly in favor of detention.

B.     The Weight of the Evidence

The weight of the evidence against Goodman militates in favor of detention. The December 4, 2023 narcotics transaction and the December 8, 2023 firearm transaction were discussed during recorded phone calls between Goodman and the CHS, and the sales were monitored by ATF agents and audio- and video-recorded by the CHS. Below is an example of the video from the December 4, 2023 narcotics transaction:



ATF agents, moreover, searched the CHS and his vehicle before the transactions, and immediately collected the narcotics and the firearm from the CHS after Goodman made the sales. As to the April 2024 felon-in-possession count, Goodman admitted possessing the relevant firearm and the

fact that he was not authorized to possess the firearm (after having served well over one year of prison time in connection with multiple felonies).

The weight of the evidence should be considered equally with the other § 3142 factors. In *United States v. Blackson*, No. 23-CR-25, 2023 WL 1778194, at *9 (D.D.C. Feb. 6, 2023), following a thorough review of the text of § 3142 and decisions analyzing this factor, Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at *10. In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). Moreover, the Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhang*, 55 F.4th 141, 149-50 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight than any other factor.

Indeed, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 WL 1778194, at *10. In this case the logic applies—the weight and strength of the evidence increases the prospect that the defendant will present a danger to the community if released.

Put simply, this factor strongly weighs in favor of detention.

C.     <u>The History and Characteristics of the Defendant</u>

Goodman also has a lengthy history with the criminal justice system. Goodman has been

convicted of attempted robbery; he has pled guilty to possession with intent to distribute marijuana;

he has pled guilty to robbery; he has pled guilty to unlawful possession of a firearm; and he has

been convicted of possessing controlled substances. Goodman has spent much of the last ten years

incarcerated in connection with these offenses. But it appears that as soon as he was released, he

continued engaging in the very conduct that previously led him to prison.

Moreover, Goodman's history of convictions does not even remotely capture the full extent

of his criminal lifestyle. He has a lengthy history of revocations and violations of probation:

- <u>2012 CF2 002009 (attempted robbery)</u>: After Goodman was released, his probation
  was revoked in January 2013 after he violated the terms. Upon his subsequent
  release after serving time for the revocation, he was revoked a second time in
  November 2013. His subsequent supervised release was revoked to incarceration
  in March 2019.

- <u>2012 CMD 021437</u> (misdemeanor distribution of marijuana and possession with
  intent to distribute marijuana): After Goodman violated the terms of his probation,
  he was revoked in February 2014.

- <u>2013 CF3 018296</u> (felony robbery and unauthorized use of a vehicle): Goodman's
  supervised release in this matter was revoked in March 2019.

- <u>2017 CF2 011171</u> (unlawful possession of a firearm): Goodman's supervised
  release in this matter was revoked to incarceration in November 2021.

- <u>2023 CMD 007457</u> (possession of ethylpentylone and PCP): Goodman failed to
  report for drug testing four months in a row and committed four of the instant
  offenses while on pre-trial release and one of the instant offenses while serving a
  probationary term on this charge.

Goodman's lengthy history of revocations and violations of probation—in fact, it appears

he has never successfully complied with release terms in *any* of his criminal cases—show that

judicial supervision will not guarantee compliance with the law. *See United States v. Munchel*, 991

F.3d 1273, 1281 (D.C. Cir. 2021) (concluding that courts can and should "consider whether it

believes the defendant will actually abide by its conditions when making the release determination"); *see, also United States v. Glasgow*, No. 20-CR-27, 2021 WL 2403136, at *12 (D.D.C. June 11, 2021) ("Because Glasgow has previously disobeyed a court-ordered condition of pre-trial supervision, the Court has little faith that he would not do so again if released pending trial."). In short, Goodman's history and characteristics establish with near certainty that he will not lead a law-abiding life if released.

      D.    <u>Nature and Seriousness of the Danger to Any Person or the Community</u>

Finally, the fourth factor, the nature and seriousness of the danger to any person or the community posed by the defendant's release, similarly favors detention. When "the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community," pretrial detention is available to "disable the arrestee from executing that threat." *Munchel*, 991 F.3d at 1280 (cleaned up). This requires the Court to make a "forward-looking determination" about the defendant's risk of danger to the community, keeping in mind that detention may be justified even if the Court does not explicitly find that the defendant is a risk of committing acts of violence. *United States v. Hale-Cusanelli*, 3 F.4th 449, 456 (D.C. Cir. 2021) ("[A] person could be deemed a danger to the community sufficient to justify detention even without posing a threat of committing violence in the future.").

Goodman does in fact pose a significant danger to the community. In this charged matter alone, he sold enough narcotics to cause overdoses many times over. He sold a firearm with ammunition. He possessed a firearm with a large capacity magazine and a bullet in the chamber. He did so while on pre-trial release for another drug case, and then again after he was convicted of that charge and on supervision. The risk to the community is palpable. The firearms captured on the Goodman iCloud are plainly not being used for lawful purposes:

 

They are being used by criminals to engage in acts of violence. The only way to prevent Defendant from purchasing or selling narcotics and/or a firearm that could be used to injure or kill someone in this city is to detain him.

## **CONCLUSION**

Each of the factors the Court must consider point to one conclusion: Goodman should be detained pretrial in this case. Moreover, a rebuttable presumption under 18 U.S.C. § 3142(e)(3)(A), which Goodman cannot rebut, dictates the same result. Accordingly, for the reasons described herein, the government respectfully requests that the Court issue an Order granting its motion that Goodman be held without bond pending trial.

DATED at Washington, D.C., this 6th day of December, 2024.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     /s/ Jonathan Jacobson
JONATHAN JACOBSON
Assistant United States Attorney
Ill. Bar Number 6317721
601 D Street NW
Washington, DC 20579
Jonathan.Jacobson@usdoj.gov
(202) 934-0886

## **CERTIFICATE OF SERVICE**

I certify that on this 6th day of December, 2024, I electronically filed the foregoing Motion for Detention with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.