**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**WALTER GOODMAN,**<br><br>Defendant. | Case No.: 24-CR-510 (CRC) |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

In December 2023, the Defendant, Walter Goodman, sold drugs and firearms to a confidential human source (the "CHS") working on behalf of the Bureau of Alcohol, Tobacco, and Firearms ("ATF") in Washington, D.C. Specifically, on December 4, 2023, the Defendant sold 14.7 grams of suspected 3,4-Methylenedioxymethamphetamine ("MDMA") to the CHS. Then, on December 8, 2023, the Defendant sold a firearm, specifically, a 9-millimeter CZ P-10 C semi-automatic pistol to the CHS. On April 16, 2024, during the execution of a residential search warrant at the Defendant's home, agents located a loaded handgun that the Defendant admitted belonged to him, which was a 9-millimeter Taurus G2C semi-automatic pistol. On April 17, 2025, the Defendant pleaded guilty to one count of Unlawful Trafficking of Firearms Through Receipt, in violation of 18 U.S.C. § 933(a)(2). During the investigation, evidence was obtained that showed the Defendant routinely obtaining illegal drugs and firearms to sell to other individuals. For the following reasons, the Government respectfully requests that the Court impose a sentence of 87 months' imprisonment followed by 3 years of supervised release.

## BACKGROUND

In December 2023, a CHS for the ATF met the Defendant, Walter Goodman, in Southeast D.C. and the Defendant offered to sell the CHS a quantity of MDMA.

1



Figure 1 – Drugs Sold to CHS

On December 4, 2023, around the 4000 block of Minnesota Ave. NE. in Washington, D.C., the Defendant sold the CHS 14.7 grams of N, N-Dimethylpentylone, a schedule I controlled substance in exchange for $150. The CHS captured the encounter on both audio and video.



Figure 2 – Still image from video of CHS meeting the Defendant

During the same December 4, 2023, meeting, the Defendant and the CHS discussed the possibility of the Defendant selling the CHS a firearm. The Defendant explained that he could sell the CHS two different types of firearms, to which the CHS told the Defendant that he would follow

2

up in a few days. Over the course of the following four days, the CHS and the Defendant spoke numerous times over the phone and coordinated the Defendant's sale of a firearm to the CHS. On one such call, the CHS stated that he wished to purchase the firearm soon, and expressed interest in a particular firearm that the Defendant mentioned to him earlier that day. The Defendant explained that he would need to obtain it but stated he would have it ready. On December 8, 2023, the CHS and the Defendant met in the same strip mall parking lot in Washington, D.C. The CHS captured the meeting on both audio and video. During the brief meeting, the Defendant sold the CHS a firearm (a 9-millimeter CZ P-10 C) and ammunition for $950.00.



Figure 3 – Firearm sold to CHS

On April 16, 2024, agents executed a search warrant at the Defendant's residence in Washington, D.C. During the search, one of the agents opened a trash can and observed a firearm magazine. The agents subsequently recovered a loaded firearm with one bullet in the chamber and 17 in the magazine.



Figure 4 – Firearm recovered during search warrant

During subsequent interviews, the Defendant confirmed that the firearm belonged to him. He further explained that the firearm recovered by the agents was his firearm and that he found it one day in a bag while he was walking in an alley. He said that he generally placed the firearm in the trash bin where agents located it. The Defendant explained that he was aware he was not legally permitted to possess a firearm. The firearm was a semiautomatic firearm that can accept a large capacity magazine.

*Procedural History*

The grand jury returned a five-count indictment on November 12, 2024. (ECF 1). On April 14, 2025, the Defendant pleaded guilty to Count Three of the indictment, one count of Unlawful Trafficking in Firearms Through Receipt in violation of 18 U.S.C. § 933(a)(2).

*The Pre-Sentence Investigation Report*

The Pre-Sentence Investigation Report (PSIR) in this matter summarizes the Defendant's personal and criminal history. The Government concurs with the guideline and criminal history

4

calculations outlined in the PSIR. The Defendant is 31 years old and was born in Washington, D.C. ¶ 59. He was raised by his mother and exposed to her drug usage at an early age. ¶ 63. He also described growing up in a "violent neighborhood" where he "frequently witnessed drug use." ¶ 65. He reported a history of substance abuse, including alcohol, marijuana, and Phencyclidine ("PCP"). ¶ 84 According to PSADC records, the Defendant tested positive for PCP on 7 occasions between September 2012 through October 2023. ¶ 92.

Prior to his arrest, the Defendant reported that he was attending GED classes but has not completed his courses. ¶ 94. At the time of his arrest, the Defendant was unemployed. ¶ 99. While he reported some employment history, such as working as a construction laborer or through youth programs, the Defendant has little to no work history, per the PSIR. ¶¶ 99-102.

The Defendant has a significant adult criminal history, with convictions dating back to 2012 for violent, drug and firearms-related, and possessory offenses. ¶ ¶ 37-41. He is pending sentencing for an Assault with a Dangerous Weapon conviction, after he stabbed another individual with a shank while incarcerated within the D.C. jail in December 2024. ¶ 42. According to the PSIR, the Defendant has had multiple revocations for noncompliance with supervised release conditions. ¶ ¶ 37-41 In addition with noncompliance on supervised release, the Defendant was sanctioned on numerous occasions while in the custody of the Bureau of Prisons ("BOP"). *Id.*

## ARGUMENT

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v.*

*United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

(i)  issued by the Sentencing Commission . . .; and

(ii) that, . . . are in effect on the date the defendant is sentenced; . . .

(5) any pertinent policy statement –

(A) issued by the Sentencing Commission . . . and

(B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## THE APPLICABLE SENTENCING GUIDELINES

The PSIR estimates the Defendant's offense level to be 21 and his criminal history to be Category VI, yielding a Guidelines imprisonment range of 77 to 96 months' imprisonment. PSIR at ¶ 112. Additionally, the PSIR reflects a Guidelines range of 1 to 3 years of supervised release. *Id.* at ¶ 117. As noted previously, the Government agrees with the guidelines and criminal history score calculations as outlined in the PSIR.

**THE GOVERNMENT'S SENTENCING RECOMMENDATION**

The Government recommends a sentence of 87 months' imprisonment, followed by 3 years of supervised release. This sentence, at the midpoint of the guidelines, reflects the serious nature of this offense, the Defendant's extensive criminal history, and the need to deter future criminal conduct. It also addresses the danger posed by the defendant's conduct- particularly the carrying of loaded firearms in connection with narcotics distribution. This recommendation also considers the Defendant's acceptance of responsibility and aligns with the PSIR author's proposed sentence.

**I.      The Nature and Circumstances of the Defendant's Offense.**

The nature and circumstances of this offense warrant a lengthy period of incarceration. The Defendant sold illegal drugs and firearms to the CHS on two separate occasions in December 2023 showing that he had the means and the ability to procure illegal firearms and drugs. At the time of the Defendant's arrest, agents found yet another loaded firearm in his residence which he admitted belonged to him. The Defendant's ability to secure firearms and drugs is concerning by itself; his distribution of these dangerous items to members of the community speaks to the danger that he poses to the community.

While the offense is possessory in nature, this Court has warned against discounting the inherent danger associated with loaded firearms. "Illegally possessing a fully loaded concealed firearm with easy, quick access in the front waistband of defendant's pants, while out in public, poses an inherent risk of danger to the community." *Blackson*, 2023 WL 1778194, at \*7. Here, not only did the Defendant sell the 9-millimeter CZ P-10 C handgun *and* ammunition to the CHS on December 4, 2023, the Defendant's firearm which was recovered at his home in April of 2024 was loaded with one round chambered and 17 rounds in the magazine. *See United States v. Kent*, 496 F. Supp. 3d 500, 502 (D.D.C. 2020), *aff'd* (Nov. 5, 2020) (finding that a defendant should be

detained pretrial in part because "the firearm recovered from the Defendant's person had a round already chambered, making the circumstances even more troubling.") Congress recently indicated how seriously these offenses should be taken when it increased maximum sentences for 18 U.S.C. 922(g) from 10 years to 15 years. The Defendant's possession of a firearm and narcotics was an inherently dangerous act that placed the community (including the Defendant and his family members) at serious risk. *See, e.g.*, *United States v. Gassaway*, No. 21-CR-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public).

This Court has repeatedly recognized the dangerousness associated with carrying a firearm in connection with drug distribution. *See, e.g.*, *United States v. Carr*, 2022 WL 13947798 (D.D.C.), 4 (slip copy) (finding the first factor weighed in favor of detention given "the combination of drug distribution *and* the illegal possession of (multiple) guns presents a serious danger to the community."); *United States v. Taylor*, 289 F. Supp. 3d 55, 71 (D.D.C. 2018) ("[A]lthough the mere fact that the defendant possessed a firearm does not constitute evidence of a danger to the community, possession of a firearm by a convicted felon who is allegedly engaged in illegal drug distribution is a different matter.") Here, the Defendant has shown that he has the means to obtain both illegal firearms and narcotics. Given the violence that accompanies drug distribution, the Defendant's behavior in this case is particularly concerning and endangers the community.

Dismissing the Defendant's behavior as "mere possession" ignores the current epidemic of gun violence in our community.[1] A loaded firearm is a deadly weapon. It has the ability with a

---

[1] *See, e.g.*, Peter Hermann, *Homicides are falling in many big cities. In D.C., they're rising.*, Wash. Post (August 19, 2023, 9:00 a.m.), https://www.washingtonpost.com/dc-md-va/2023/08/19/dc-homicides-rising-major-cities/ ("But more than halfway through this year, killings in the District are surging toward numbers not seen in two decades . . . ."); Matt Gregory, *Tale of two cities: Homicides down in Baltimore, up in DC*, WUSA9 (December 28, 2023),

single pull of the action to end a life. A firearm can escalate a mundane disagreement or a petty offense into a deadly encounter. And the reason law enforcement targets the possession of firearms prior to the commission of a crime is because once an individual makes the decision to produce a firearm and pull the trigger, law enforcement is powerless to intervene. In a case like this where the Defendant was engaged in the possession and trafficking of multiple firearms, a lengthy term of incarceration is not only justified but necessary.

2.  **The History and Characteristics of the Defendant.**

This is not the Defendant's first offense. While the Government does not dispute the Defendant's traumatic past and family history, this in no way justifies the Defendant's prolific criminal history, which dates back to 2012, when he was just eighteen years old.

In 2012, in case number 2012 CF2 002009, the Defendant pleaded guilty to attempted robbery and ultimately served 12 months after multiple revocations. ¶ 37. According to BOP records, he incurred multiple disciplinary sanctions during his incarceration for behavior ranging from failing to obey orders to assault. *Id.*

In 2013, in case number 2012 CMD 021437, the Defendant pleaded guilty to misdemeanor distribution of marijuana and possession with intent to distribute marijuana, and was ultimately sentenced to 90 days of incarceration. ¶ 38. In February 2014, his probation was revoked and he was sentenced to a time served sentence. *Id.*

In 2013, in case number 2013 CF3 018296, the Defendant pleaded guilty to felony robbery and unauthorized use of a vehicle, and was sentenced to 32 months in prison and three years of

---

https://www.wusa9.com/article/news/local/homicides-go-down-in-baltimore-less-than-300-dc-homicides-hit-20-year-high/65-14e1f98e-d82c-4878-a5c0-9ac461c47899 ("At the time this article was written DC Police had investigated 271 homicides so far this year, according to the Metropolitan Police Department (MPD.) This time last year the city was at 199.")

supervised release. ¶ 39. According to police paperwork, in October 2013, while the victim was at the trunk of his vehicle to change out of his work boots, the Defendant hopped into the driver's seat and sped off with the victim's car. An eyewitness observed the incident and flagged down law enforcement. Law enforcement observed the victim's vehicle and attempted a traffic stop. The Defendant fled from law enforcement in the vehicle until it crashed into two parked vehicles. The Defendant continued to flee on foot but was ultimately apprehended. A show-up was conducted and the Defendant was positively identified as the individual who took the victim's vehicle. In March 2019, the Defendant's supervision was revoked, and he was sentenced to 10 months' incarceration. *Id*.

In 2017, in case number 2017 CF2 011171, the Defendant pleaded guilty to unlawful possession of a firearm and was sentenced to two years in prison and three years of supervised release. ¶ 40. According to police paperwork, in June 2017, law enforcement responded to a call regarding a suspicious individual near a school playground. Law enforcement observed the Defendant matching the description and stopped him. Law enforcement asked the Defendant if he had anything on him and conducted a protective pat-down after the Defendant consented to a search by raising his arms. During the pat-down however, the Defendant attempted to flee from law enforcement. The Defendant was detained and a firearm recovered from his right pant leg. The firearm was loaded with eight rounds in the magazine. In November 2021, his supervision was revoked, and he was sentenced to 9 months' incarceration. *Id*.

In March 2024, in case number 2023 CMD 007457, the Defendant was convicted after a bench trial of two misdemeanor counts of possession of a controlled substance (PCP and ethylpentylone). ¶ 41. The Defendant was serving a probationary sentence on these offenses at the time of the April 2024 search warrant at his residence. *Id.* According to BOP records, he

received multiple sanctions for failing to follow orders while he was incarcerated. *Id.* While he was on supervision, he violated the conditions of his supervision on multiple occasions by testing positive for marijuana and failing to report for drug testing. *Id.*

While he was incarcerated pending trial for the instant case, the Defendant was charged and convicted of one count of Assault with a Dangerous Weapon in case number 2025 CF2 00108. ¶ 42. The Defendant pleaded guilty on May 28, 2025 for stabbing another individual with a sharp object while incarcerated at the Central Detention Facility of the D.C. Jail. *Id.*

During the investigation in this case, agents obtained a warrant for the Defendant's Apple iCloud account and reviewed the contents. The Defendant's iCloud showed that he regularly distributed drugs and that he occasionally sold firearms also. His chats reflected numerous firearm transactions around the period of the charged conduct and other such transactions within the last few years. The Defendant's text messages also show that he purchased a firearm in late 2021, after he sustained multiple felony convictions that prohibited him from possessing firearms. The text messages also reflect that the Defendant has on at least one occasion been a middleman in a firearm transaction, as he was in this offense.

 

Figure 5 – Photos from the Defendant's phone depicting the firearm that he purchased and sold

Text messages on the Defendant's phone also show that on January 11, 2022, he purchased a firearm from one associate and sold it to another individual he was communicating with.

The Defendant has continued to reoffend and has secured conviction after conviction since 2012. Despite being given the opportunity of community supervision, the Defendant's has been unable to comply with the conditions of supervised release. His supervision has been revoked on numerous occasions due to noncompliance on all the cases for which he was placed on supervision. His recidivism demonstrates that he cannot follow court orders and demonstrates a disregard for the law. The Defendant's history and characteristics justify a lengthy term of imprisonment.

## II.     The Need for the Sentence Imposed.

The requested sentence is sufficient but no greater than necessary to meet the goals of sentencing. The sentence provides specific deterrence: it will keep our community safe from the Defendant for a significant period. It provides general deterrence: it will signal to the community that the possession of illegal firearms in connection with the sale of narcotics is a deadly serious matter and hopefully deter others from doing so. And it provides an opportunity for the Defendant to truly reflect on the serious and repetitive nature of his crimes.

The Defendant has spent much of his adult life incarcerated for very serious offenses. Despite the multiple periods of incarceration, and despite knowing that carrying firearms and dealing drugs can lead to violence, the Defendant continued to obtain illegal firearms and illegal drugs for distribution to the community. Multiple prison sentences, court supervision, and the threat of rearrest have done nothing to deter him from continuing his criminality. He is now 31 years old and no longer has the excuse of youth or impulsiveness that he may have had previously. The requested sentence of 87 months' incarceration is a reasonable one and the Government respectfully recommends this sentence to the Court.

## **CONCLUSION**

For all the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 87 months of incarceration followed by three years of supervised release.

                                            Respectfully submitted,

                                            JEANINE FERRIS PIRRO
                                            UNITED STATES ATTORNEY

By:          */s/ Sabena Auyeung*
                Sabena Auyeung
                IL Bar No: 6317842
                Assistant United States Attorney
                601 D Street NW
                Washington, D.C. 20530
                202-803-1622
                Sabena.Auyeung@usdoj.gov